# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

DENNIS O. CHRISTENSEN,

        Petitioner,

v.

                                        Case No. 3:21-cv-722-TJC-PDB

SECRETARY OF THE FLORIDA
DEPARTMENT OF CORRECTIONS
and FLORIDA ATTORNEY GENERAL,

        Respondents.

_____

## ORDER

## I.    Status

Petitioner, an inmate of the Florida penal system, is proceeding on a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (Doc. 1). Petitioner challenges three state court (Clay County, Florida) judgments of conviction for which he is serving a combined fifteen-year prison term. He filed exhibits with his Petition (Docs. 1-2 to 1-5). Respondents filed a Response (Doc. 12) with exhibits (Docs. 13-1 to 13-34).[1] Petitioner filed a Reply (Doc. 18). This case is ripe for review.[2]

---

[1] The Court will cite exhibits by document and page number as assigned by the Court's electronic case management system.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th

## II.   <u>Governing Legal Principles</u>

### A. Standard Under § 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016) (explaining AEDPA deference), <u>abrogation in part on other grounds recognized by</u> <u>Smith v. Comm'r, Ala. Dep't of Corr.</u>, 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>Harrington v. Richter</u>, 562 U.S. 86,

---

Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes

federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified) (emphasis in original).

## B. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable,

4

professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

The two-part Strickland test applies to challenges to the validity of guilty pleas based on ineffective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 58 (1985). The petitioner must still show that counsel's performance was deficient. See id. at 56-59; Lynch v. Sec'y Fla. Dept. of Corr., 776 F.3d 1209, 1218 (11th Cir. 2015). To establish prejudice, however, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59 (footnote omitted); Lynch, 776 F.3d at 1218.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland, "If it is easier to dispose of an ineffectiveness claim on the ground of

lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.[3]

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to

_____

[3] This two-part <u>Strickland</u> standard also governs a claim of ineffective assistance of appellate counsel. <u>Overstreet v. Warden</u>, 811 F.3d 1283, 1287 (11th Cir. 2016). "Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." <u>Id.</u> (internal quotations and citations omitted). To satisfy the prejudice prong, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." <u>Black v. United States</u>, 373 F.3d 1140, 1142 (11th Cir. 2004). <u>See also</u> <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal").

the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105).

### III.   **Procedural History & Factual Background**

Petitioner's convictions arise out of an incident that occurred on August 18, 2015, in Keystone Heights, Florida. Doc. 13-1 at 16, 21. The incident started when Petitioner's neighbor pulled to the side of the road when he spotted Petitioner, who he (the neighbor) thought was "stuck in [a] ditch." Id. at 16, 21. See also Doc. 13-10 at 741-44. Petitioner declined assistance and became admittedly agitated that the victim insisted on helping him even after Petitioner said he did not need or want help. Doc. 13-1 at 16, 21. See also Doc. 13-10 at 741, 743; Doc. 13-11 at 532. Petitioner, who was intoxicated at the time, told the victim to "leave [him] the fu*k alone" and "showed him [his] gun." Doc. 13-11 at 532. Upon seeing the gun, which the victim claimed Petitioner pointed at him, the victim drove away and called the police. Doc. 13-1 at 16, 21. See also Doc. 13-10 at 741, 743. The victim drove to his house after calling the police, but Petitioner was blocking his driveway and "waving" his gun around, so he waited down the street for the police to arrive. Doc. 13-1 at 16, 21. See also Doc. 13-10 at 741, 743.

When the police arrived about twenty-two minutes after the victim called, both the victim and Petitioner were interviewed. Doc. 13-1 at 16-17, 22. See also Doc. 13-10 at 753. Because Petitioner did not immediately answer his door when

the police knocked, the victim did not return home for some time. Doc. 13-1 at 16-17, 22.[4] When the victim finally returned home, he found his front door open and a trail of blood leading from the front porch to his bedroom, where he found his dog "bleeding . . . from what appeared to be a gunshot wound." Id. at 22; Doc. 13-10 at 743. He also found a shell casing on his living room floor. Doc. 13-1 at 22. The victim again called the police, believing Petitioner was to blame. Id.

On August 21, 2015, officers arrested Petitioner pursuant to an arrest warrant and executed a search warrant of Petitioner's home, searching for the gun believed to have been used to shoot the victim's dog. Id. at 12-14, 24-25. See also Doc. 13-10 at 743. Along with the gun Petitioner used to shoot the dog, the police found other guns and ammunition. Doc. 13-1 at 25. While some officers executed the search warrant, another officer interviewed Petitioner inside his police car. Doc. 13-10 at 744, 747. The interview was audio recorded. Id. During the interview, Petitioner stated that he was "extremely drunk" and "aggravated with the victim" for insisting on helping him after he declined assistance, so Petitioner drove to the victim's home, "kicked [open] the front door" and "shot the [victim's] damn dog." Doc. 13-11 at 533. See also Doc. 13-10 at 744. In later summarizing the audio-recorded interview, the arresting officer reported that

_____

[4] The arrest warrant affidavit says Petitioner did not answer the door for thirty minutes, Doc. 13-1 at 17, while the search warrant affidavit says ninety, id. at 22.

Petitioner also admitted to going "inside [the victim's home] to try to confront anyone inside." Doc. 13-10 at 744. Petitioner did not in fact admit that he went inside the victim's home. <u>See</u> Doc. 13-11 at 533.

The State of Florida charged Petitioner with the following crimes in three cases: (1) aggravated assault with a deadly weapon in case number 2015-CF-1135; (2) armed burglary and cruelty to animals in case number 2015-CF-1136; and (3) possession of a firearm by a convicted felon in case number 2015-CF-1158. Doc. 13-1 at 26, 43. With the assistance of counsel, Petitioner entered an open plea of guilty to all charges on May 2, 2016, about one week before trial was set to begin. <u>Id.</u> at 92, 96-97. <u>See also</u> Doc. 13-11 at 680, 697-98. The attorney who represented Petitioner at the plea hearing, Mr. Sieron, Petitioner had retained the week before. Doc. 13-1 at 86-87; Doc. 13-11 at 416. The attorney who represented him before that, Mr. Taylor, Petitioner fired after only one month. Doc. 13-11 at 439-40. The original attorney Petitioner hired, Mr. Porter (who enlisted the help of Mr. Shumard, with the same firm at the time), Petitioner fired after about seven months. <u>Id.</u> at 451-52. Petitioner's original attorneys, Mr. Porter and Mr. Shumard, moved for a reduction of Petitioner's bail and conducted discovery, among other things. Doc. 13-1 at 27-29; Doc. 13-11 at 452, 454-55.

Petitioner signed plea agreements in all three cases, acknowledging that he read and understood the agreements, was competent, entered into and

9

signed the pleas "freely and voluntarily," and that "[n]o other agreements, representations, or promises ha[d] been made by [himself], [his] attorney, the Court, or any representative of the State." Doc. 13-11 at 597-602. He further agreed that he understood the rights he was giving up (e.g., the rights to trial and to appeal); that he had "ample time to discuss th[e] agreement[s] with [his] attorney," including the charges against him and any possible defenses; that he had "sufficient time to consider all charges against [him], all possible defenses and circumstances of mitigation, the advice of [his] attorney, the constitutional rights forfeited by entering into th[e] plea agreement[s], and the potential consequences" of entering a plea. Id. at 597, 599, 601. Additionally, the plea agreements included the following statement:

> I hereby enter my plea of guilty because I am guilty. Before entering such plea of guilty, I was advised of the nature of all the charges against me, the statutory offenses included within such charges, the range of maximum allowable punishments for each charge, all the possible defenses to each charge, and all circumstances in mitigation of such charges. I have been advised of all other facts essential to a full and complete understanding of all offenses with which I have been charged, and of all offenses to which I am entering this plea. I have been advised of all direct consequences of the sentence to be imposed.

> I considered this plea to be to my advantage, and I have freely and voluntarily entered my plea of guilty. I have not been offered any hope of reward, better treatment, or certain type of sentence to get me to enter this plea. I have not been promised by anyone, including my attorney, that I would actually serve any

10

> certain amount of time, and I understand that any early release of any sort is not a part of this plea agreement and is entirely within discretion of governmental agencies of than [sic] this Court. <u>I have not been threatened, coerced, or intimidated by any person, including my attorney</u>, in any way in order to get me to enter this plea.

<u>Id.</u> (emphasis added).

At the plea hearing, the trial court conducted the requisite plea colloquy, during which Petitioner swore under oath that he understood his attorney was "tendering on [his] behalf a plea of guilty to the four charges . . . filed against [him]" and had "an opportunity to speak with [his] attorneys about the facts of all th[e] cases and possible defenses." Doc. 13-1 at 97. The trial court asked him if he understood the nature of the charges and the maximum punishments associated with each. <u>Id.</u> at 97-98. He said he did. <u>Id.</u> at 98. Petitioner further stated he understood he was giving up his right to a jury trial and to appeal:

> THE COURT:   Now, do you understand that when you plead guilty to these cases and these charges you give up your right to a jury trial?
>
> [PETITIONER]:  Yes, sir.
>
> THE COURT:   And so you understand that if I accept your plea the trial that was set for next week will not go forward?
>
> [PETITIONER]:  Yes, sir.
>
> THE COURT:   Do you understand if we did have those trials the State would be required to call witnesses and produce other evidence to prove you guilty beyond a reasonable doubt?

> [PETITIONER]:   Yes, sir.
>
> THE COURT:      And you understand if we had a trial your attorney would have the right to cross-examine or question the State's witnesses?
>
> [PETITIONER]:   Yes, sir.
>
> THE COURT:      And do you understand your attorneys would have the right to call witnesses and produce other evidence on your behalf at a trial?
>
> [PETITIONER]:   Yes, sir.
>
> THE COURT:      Do you understand that when you plead guilty you give up your right to remain silent regarding the facts and circumstances of all of these cases?
>
> [PETITIONER]:   Yes, sir.
>
> THE COURT:      And do you understand that when you plead guilty you give up your right to challenge the State's evidence, to file any motions, or appeal anything that has occurred so far in these cases?
>
> [PETITIONER]:   Yes, sir.

Id. at 98-100. Petitioner confirmed he had reviewed and discussed with his attorney the three plea forms and acknowledged his signature on each form. Id. at 100. He said he understood that he had not reached an agreement with the state regarding a recommended sentence and that the trial court could "sentence [him] to the maximum amount allowed by law." Id. at 101. The trial court asked Petitioner if he had been promised anything or coerced into entering a plea, and he said he had not:

> THE COURT:      Okay. Now, other than the fact that we have the minimum mandatories, which I've advised you of, that I have no discretion over, has anybody

12

promised you anything to get you to plead guilty?

[PETITIONER]:  No, sir.

THE COURT:      Have you been threatened or coerced
in any way?

[PETITIONER]:  No, sir.

Id. at 102. Petitioner said he understood that the judge was required by law to sentence him to a minimum mandatory as indicated by "a guidelines calculation" and that the state had asked the court to run his sentence on the possession charge concurrently with the other sentences. Id. at 101-02. Again, the trial court asked Petitioner if he had been coerced into entering a plea. Id. at 103. Petitioner responded that he had not been coerced and was entering a guilty plea because he was guilty:

THE COURT:      Okay. All right. And have you been threatened or coerced in any way?

[PETITIONER]:  No, sir.

THE COURT:      And have you had enough time to think about how you want to proceed?

[PETITIONER]:  Yes, sir.

THE COURT:      And has your -- your attorneys, well, you've had three, but they've answered all the questions that you've had?

[PETITIONER]:  Yes, sir. Yes, sir.

THE COURT:      Okay. [Mr. Sieron] did it?

[PETITIONER]:  (Nods head.)

THE COURT:      All right. And you're satisfied with the job he's done for you?

[PETITIONER]:  Yes, sir.

13

> THE COURT:      Okay. And are you pleading guilty to all of these charges because considering all the circumstances you think it's in your best interest?
>
> [PETITIONER]:   Yes, sir. I'm guilty.
>
> THE COURT:      Okay. All right. Well, I appreciate that.

Id. The trial judge asked Petitioner's counsel whether there was a stipulation to the factual basis, and counsel responded, "Yes, sir." Id. at 104. At the conclusion of the hearing, the trial judge found "all three pleas to be knowingly, freely, voluntarily, and intelligently made." Id. See also Doc. 13-11 at 598, 600, 602.

At his sentencing hearing, Petitioner read a letter his attorney (Mr. Sieron) typed for him at his direction. Doc. 13-1 at 119; Doc. 13-11 at 696-97. Petitioner blamed his behavior on alcohol, saying he had been in and out of AA over the years. Doc. 13-1 at 119-20. He claimed to have shot the victim's dog because it "came at [him] barking," and he thought the dog was going to bite him. Id. at 119. The dog was a dachshund. Doc. 13-10 at 735. The dog survived after undergoing "extensive surgery." Id.

The trial court sentenced Petitioner as follows: to a term of five years in case number 2015-CF-1135 (aggravated assault with a deadly weapon); to a term of ten years on count one (armed burglary) and a concurrent term of five years on count two (cruelty to animals) in case number 2015-CF-1136; and to a term of five years in case number 2015-CF-1158 (possession of a firearm by a

convicted felon). Doc. 13-1 at 141-42; Doc. 13-10 at 660-63, 670-74, 680-82. Finding "a separation both temporally and geographically between the aggravated assault" and the burglary, the trial court imposed Petitioner's sentences in case numbers 2015-CF-1135 and 2015-CF-1158 to run consecutive to the sentences in case number 2015-CF-1136. Doc. 13-1 at 33-40, 44, 141; Doc. 13-10 at 660-63, 680-82.

Petitioner appealed the judgments in all three cases to Florida's First District Court of Appeal. Docs. 13-2, 13-3. The First DCA dismissed the appeals in case numbers 2015-CF-1136 and 2015-CF-1158 for Petitioner's failure to comply with a court order. Doc. 13-10 at 675, 683. As to case number 2015-CF-1135 (aggravated assault), Petitioner's court-appointed appellate attorney filed an <u>Anders</u>[5] brief, advising that Petitioner's appeal "[did] not have any arguable legal issue" given the "plea colloquy was consistent with that required by law." Doc. 13-4 at 10. Petitioner filed a pro se brief, raising numerous issues. Doc. 13-5. The First DCA per curiam affirmed without a written opinion Petitioner's judgment and sentence in case number 2015-CF-1135. Doc. 13-8. The mandate issued on April 11, 2017. Doc. 13-9.

Thereafter, Petitioner filed in the trial court a motion for postconviction relief (and multiple amendments) under Florida Rule of Criminal Procedure

---

[5] <u>Anders v. California</u>, 386 U.S. 738 (1967).

3.850. <u>See generally</u> Doc. 13-13. The postconviction court dismissed many of the claims Petitioner raised in his fifth amended Rule 3.850 motion because he had not sufficiently pled them but gave him an opportunity to amend and reserved ruling on the other claims. Doc. 13-10 at 641-53. After Petitioner filed a sixth amended Rule 3.850 motion, the postconviction court granted an evidentiary hearing on three of his fourteen grounds: one alleging a <u>Brady</u>[6] violation and two alleging ineffective assistance of trial counsel. Doc. 13-11 at 550.

At the postconviction evidentiary hearing, held on June 10, 2019, Petitioner testified that he did not confess to going inside the victim's home and explained a shell casing was found in the living room because he "had to turn the gun sideways" because of how close the dog was to him, and the "shell flew in[side]." <u>Id.</u> at 410. According to the transcript of Petitioner's recorded police interview—which was entered at the evidentiary hearing—Petitioner did not tell the officer he "went inside" the victim's home. <u>Id.</u> He did admit to shooting the victim's dog, which was "just inside the [front] door" when he kicked it in. <u>Id.</u>

Of the four attorneys who worked on Petitioner's case, only Mr. Shumard—who conducted all the depositions—would have listened to the audio recording of Petitioner's interview by the arresting officer, but Mr. Shumard

---

[6] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

could not "say with a hundred percent certainty that [he] reviewed it." Doc. 13-1 at 467-68. However, he recalled taking the arresting officer's deposition and discussing the audio recording with Petitioner. <u>Id.</u> at 467.

The postconviction court denied Petitioner's fifth and sixth amended Rule 3.850 motions.[7] Doc. 13-14. Petitioner appealed the denial to the First DCA. Doc. 13-15. The First DCA granted Petitioner's motion to supplement the record to include the audio recording of the arresting officer's interview of Petitioner, Doc. 13-31 at 50, but ultimately per curiam affirmed the postconviction court's denial of his postconviction motions without a written opinion, Doc. 13-19. The mandate issued on July 19, 2021. Doc. 13-20.

Petitioner raises fourteen grounds for relief in his Petition before this Court; however, some of his grounds include multiple claims, and many of his claims he repeats in more than one ground. <u>See generally</u> Doc. 1. The Court will address each redundant claim once, organizing the analysis by claim rather than by the ground as numbered in the Petition. The gravamen of Petitioner's complaint in all grounds is that the audio recording of his police interview proves he did not commit burglary because he did not confess to walking inside the victim's home but only to kicking the door open and shooting the dog. <u>See generally id.</u> He contends that, had he known the arresting officer "perjured"

---

[7] The postconviction court noted that Petitioner raised the same fourteen grounds in both his fifth and sixth amended Rule 3.850 motions. Doc. 13-14 at 3.

himself in his report, he would have insisted on going to trial. Id. at 5, 20, 22, 26, 34.

## IV.   <u>Analysis</u>

### A. Involuntary Plea

In Grounds One, Three, Five, Six, Eight, Nine, Ten, Twelve, Thirteen, and Fourteen, Petitioner contends his guilty plea was involuntary, thus failing to satisfy the minimal requirements of due process. Doc. 1 at 5, 8, 14, 16, 18-19, 22, 25-26, 28, 31, 33, 35, 38. He argues his plea was coerced by a "fabricated confession enabled by state suppression of . . . [audio tape] evidence," his attorneys' ineffective representation, and the trial court's bias in favor of the state. Id.[8] In particular, he faults the prosecutor for failing to inform his attorneys and the trial court of the material difference between the arresting officer's written report and the audio recording of his interview and for

---

[8] Petitioner argues throughout his Petition that he was denied the right to be presumed innocent until proven guilty, contending that section 14 of the Florida Constitution "contravenes" the "presumption of innocence in the superior document, [the] Federal Constitution." Doc. 1 at 8, 14, 22, 28, 31, 33, 35, 38. It is unclear what Petitioner means by this. The presumption of innocence is not a Constitutional guarantee but rather one that "lies at the foundation of the administration of our criminal law." <u>See</u> <u>Taylor v. Kentucky</u>, 436 U.S. 478, 483, 485-86 (1978) ("While use of the particular phrase 'presumption of innocence'—or any other form of words—may not be constitutionally mandated, the Due Process Clause of the Fourteenth Amendment must be held to safeguard 'against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.'"). Moreover, Petitioner misreads section 14 of the Florida Constitution or quotes it out of context. <u>See</u> Doc. 1 at 8, 14, 22, 28, 31, 33, 35, 38. In any event, federal habeas relief is for violations of federal—not state—law, and Petitioner waived his right to be presumed innocent when he pled guilty to all charges.

threatening him with a life sentence if he were to proceed to trial. Id. at 5, 15-16, 18, 28, 33. He faults his attorneys for not knowing the audio recording of his interview differed materially from what the arresting officer wrote in his report and contends that Mr. Sieron gave him an ultimatum, saying that if Petitioner did not enter a guilty plea, he (the attorney) would withdraw because he would not have had enough time to prepare for trial, which was set to begin the following week. Id. at 5, 17-18, 31.

As to alleged coercion by the trial court, Petitioner claims the judge "displayed his overwhelming bias and corrupt favoritism of the state actors" by denying Petitioner a continuance when he retained Mr. Sieron, saying a continuance would only serve to "delay the inevitable";[9] accepting as true the "perjured police report[]" as the "facts of the case" rather than presuming his innocence; and knowing that a member of Petitioner's "defense team," Mr. Shumard, was simultaneously working as a prosecutor in Duval County.[10] Id.

---

[9] As is evident from the transcripts of the final pretrial hearing and the evidentiary hearing on Petitioner's Rule 3.850 motions, Mr. Sieron never moved for a continuance and accepted the representation with only one week until trial believing it was merely a "mitigation case." See Doc. 13-1 at 88-90; Doc. 13-11 at 691-92.

[10] In his Petition, Petitioner says that in 2020, his prison "bunk mate[]" informed him of "[Mr.] Shumard's dual role of playing defense attorney while simultaneously employed as [an] assistant state attorney." Doc. 1 at 19. Petitioner wrote a letter to the Attorney General in 2021 asking for information on Mr. Shumard's purported employment with the State Attorney's Office, saying "[i]t is on the prison rumor mill that [Mr. Shumard] was an assistant state attorney which means he was in contest with his home district when on [his] alleged defense team in 2015, 2016." Doc. 1-2 at

at 8, 10, 17, 19, 31, 35. Petitioner contends that "[i]f not for coercion, denial of due process, and faulty advice from counsel, [he] would not have plead [sic] out . . . and insisted on going to trial." Id. at 20, 26.

Petitioner raised this claim as ground one in his Rule 3.850 motions. Doc. 13-13 at 75-79, 116-20. In denying the claim, the postconviction court found as follows:

> [Petitioner] asserts that he was coerced into pleading guilty (1) "by the lack of information from [his] defense attorneys," (2) by the lack of access to the jail law library, (3) by the Court's comments at the bond reduction hearing and pretrial hearings, (4) "by the lies of State actors," (5) by his attorneys' lack of due diligence and "acting as prosecutors," (6) by the Court's denial of his motion for continuance of the trial, (7) by Sieron's comment that the State "was threatening" him with life in prison if he went to trial and lost, and (8) by Sieron's "threat to withdraw as counsel."

> At the time of his plea, [Petitioner] signed Plea of Guilty forms in each one of the above-styled cases. Those forms, which [Petitioner] acknowledged in open court and to which he asserted he understood the rights, contain provisions affirming that [Petitioner] had "not been threatened, coerced, or intimated by any person, including [his] attorney, in any way in order to get [him] to enter this plea." The forms also provide that [Petitioner] had sufficient time to consider all the charges, possible defenses, and circumstances in mitigation, advice of his attorney, the constitutional rights forfeited, and the potential consequences of entering the plea.

> Further, at the plea hearing, [Petitioner] testified

---

49. The State Attorney for the Fourth Judicial Circuit responded on May 7, 2021, advising Petitioner, "There are no records responsive to your request." Id. at 51.

under oath that he had not been threatened or coerced in any way. He also stated that he had enough time to think about how he wanted to proceed and that all of his attorneys had answered all of his questions and he was satisfied with his current attorney's work. The Court notes that several weeks passed between the time [Petitioner] entered his plea and the time he was sentenced, and [Petitioner] never raised a concern about the voluntariness of his plea. [Petitioner] cannot now go behind his sworn statements made at the plea hearing. See Stano v State, 520 So. 2d 278, 280 (Fla. 1988); Jones v. State, 680 So. 2d 585, 587 (Fla. 4th DCA 1996) (explaining that a defendant cannot "stand mute, accept the benefits of the plea, and then collaterally attack its voluntariness on the basis of something that should have been cleared up at the time of the plea."). The Court finds [Petitioner] is not entitled to relief on [this] Ground . . . .

Doc. 13-14 at 4-5. The First DCA per curiam affirmed without a written opinion.

Doc. 13-19. The Court will address the claim in accordance with the deferential

standard for federal court review of state court adjudications.

The Court finds the record amply supports the state court's adjudication

of this claim. As Petitioner himself acknowledged in his plea forms and at his

plea hearing, his plea waived a multitude of federal constitutional rights,

including the right to a jury trial, at which he would be presumed innocent until

proven guilty beyond a reasonable doubt. See Doc. 13-11 at 597-602. See also

Doc. 13-1 at 97-104. "Solemn declarations in open court carry a strong

presumption of verity" and "constitute a formidable barrier in any subsequent

… proceeding." Blackledge v. Allison, 431 U.S. 63, 74 (1977). See also Winthrop-

Redin v. United States, 767 F.3d 1210, 1217 (11th Cir. 2014) (explaining that a defendant who makes statements under oath at a plea colloquy "bears a heavy burden to show his statements were false") (quoting United States v. Rogers, 848 F.2d 166, 168 (11th Cir. 1988)).

Moreover, at his postconviction evidentiary hearing, Petitioner testified that he entered a plea because he "was out of money" after paying multiple attorneys to represent him, and he was "tired of being in the jail with no access to any laws." Doc. 13-11 at 676-77. He said he did not speak with Mr. Sieron before entering his plea about his concern related to the audio recording of his police interview because, after he heard the trial court would not continue the case, he "figured [he] could fix" the problem "[r]ight at the prison." Id. at 677. He did not say his belief was based on anything said or promised by the trial court, the prosecutor, or his counsel. See id.

Upon thorough review of Petitioner's plea forms and plea colloquy and given the totality of the facts and circumstances surrounding Petitioner's open plea of guilty, the Court finds that the state court's adjudication of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Accordingly, Petitioner's claim that his plea was involuntary is denied.

## B. Ineffective Assistance of Counsel

Petitioner raises claims of ineffective assistance of both trial and appellate counsel. See generally Doc. 1. He complains his trial attorneys were ineffective primarily for failing to discover and bring to his and the trial court's attention the discrepancy between the audio recording of his police interview and the arresting officer's written report summarizing the interview, but he also contends they were ineffective for failing to raise a Stand Your Ground defense. Id. at 5, 10, 12, 15, 17, 19, 29. He says that if not for his trial attorneys' "inept advice," he would have insisted on going to trial. Id. at 5, 10, 15. Additionally, Petitioner claims his attorney on direct appeal was ineffective for filing an Anders brief rather than pursuing the issues he identified in his pro se brief. Id. at 36.

Before addressing Petitioner's individual ineffective assistance of counsel claims, the Court will address a threshold argument Petitioner raises: that the Cronic[11] standard, rather than the Strickland standard, applies to his ineffectiveness claims. Id. at 10, 12. In Cronic, the Supreme Court ruled that an accused asserting an ineffective assistance of counsel claim does not have to demonstrate prejudice when he is "complete[ly] den[ied] . . . counsel," when he is "denied counsel at a critical stage of his trial," or "if counsel entirely fails to

---

[11] United States v. Cronic, 466 U.S. 648 (1984).

subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659.

Although unclear, it appears Petitioner invokes the <u>Cronic</u> standard because the trial court refused to continue his case even though he had retained new counsel (Mr. Sieron) only one week before trial was set to begin, his attorneys did not "test for truthfulness" the victim's statements or the arresting officer's sworn statement, and the Florida criminal justice system "grossly malfunctioned." <u>See</u> Doc. 1 at 10, 12, 37.[12] Despite Petitioner's apparent displeasure with his trial attorneys, there is no evidence Petitioner was completely denied counsel at a critical stage of his criminal proceedings, or that his attorneys "fail[ed] to subject the prosecution's case to meaningful adversarial testing." <u>See</u> <u>Cronic</u>, 466 U.S. at 664-66 (holding the circumstances did not justify a presumption that the defendant's trial counsel was ineffective even though counsel had only twenty-five days to prepare for what was his first criminal jury trial, given "the only bona fide jury issue" was whether the

---

[12] Petitioner did not seek a continuance of the trial date. <u>See</u> Doc. 13-1 at 87-88. At the final pretrial conference when Mr. Sieron appeared on Petitioner's behalf, Mr. Sieron requested only an extension of one week in which to negotiate with the state, saying, "[O]bviously I just came into the case last week and we're requesting that the Court extend the period for negotiation for an additional week to next Monday." <u>Id.</u> The trial court agreed to that but advised it "would not be amenable to a motion to continue the case," given, among other reasons, the court's "suspicion that . . . [Petitioner] was attempting to defer the inevitable by retaining counsel shortly before trial." <u>Id.</u> at 88. The trial court noted, "[Petitioner] had very fine competent counsel from the outset of this case." <u>Id.</u>

defendant had an intent to commit mail fraud). On the contrary, collectively, Petitioner's separate trial attorneys moved for a reduction of his bail, conducted discovery, which included taking numerous depositions, and met or communicated with Petitioner and his family in accordance with their respective—and in some cases limited—terms of engagement. See Doc. 13-1 at 27; Doc. 13-11 at 654-57, 659-62, 664-67, 678, 691, 693, 712, 714; Doc. 13-12 at 1; Doc. 13-16 at 389. Accordingly, the Cronic standard is inapplicable here.

### i.   Failure of Trial Counsel to Obtain or Review the Audio Recording of Petitioner's Police Interview

Petitioner argues in Grounds One, Four, Five, and Six that his trial attorneys were ineffective for failing to (1) adequately communicate with and advise him, (2) investigate or listen to the audio recording of his police interview and "learn of [the officer's alleged] fabrication," (3) object when the prosecutor represented the facts as stated in the arresting officer's "perjured" written report. Doc. 1 at 5, 10, 12, 17, 19. Petitioner raised similar allegations in his Rule 3.850 motions, Doc. 13-13 at 125-27, which the postconviction court construed as three sub-claims: failure of Mr. Porter to effectively communicate with Petitioner about his case; failure of all attorneys to investigate his case and demand and listen to the audio recording of his police interview; and failure of Mr. Porter to object at his bail reduction hearing to the prosecutor's summary of facts, which were based on the arresting officer's written report. See Doc. 13-

14 at 8-10.[13] The postconviction court found Petitioner failed to sufficiently plead the first sub-claim (Mr. Porter's failure to communicate) and denied the other two sub-claims after an evidentiary hearing. Id. In doing so, the postconviction court noted the two-prong Strickland test and recognized the nuances of the prejudice prong analysis in the context of a guilty plea. Id. at 7.[14]

On the claim Petitioner raises in this Court—that his trial counsel failed to investigate or obtain the audio recording of his police interview or alert the trial court or himself of the discrepancy—the postconviction court found as follows:

> [Petitioner] argues counsel was ineffective for failing to investigate the case and the State's evidence. Specifically, [Petitioner] asserts that all his attorneys were ineffective for failing to listen to the "confession audio tape" and for failing to demand the audio tape under Florida Rule of Criminal Procedure 3.220.
>
> [Petitioner] introduced an audio tape at the evidentiary hearing for the Court's review. [The

---

[13] In his Petition before this Court, Petitioner asserts one ineffective assistance of trial counsel claim (in multiple grounds) based on his attorneys' failure to obtain and review the audio recording of his police interview. The gravamen of his claim is this: his trial attorneys were deficient for not knowing the audio recording contradicted the officer's summary of his interview and, therefore, they could not have objected when the prosecutor made statements in reliance on the officer's report or corrected the record at his various court appearances. See Doc. 1 at 5, 10, 12, 17. He does not raise a stand-alone claim that he was denied the effective assistance of counsel at his bail reduction hearing. See id.

[14] As he does in his Petition, Petitioner stated in his Rule 3.850 motions that the Cronic standard should apply. See Doc. 13-13 at 126. The postconviction court did not directly address this assertion but implicitly found the Cronic standard did not apply given it cited Strickland and Hill in its order. See Doc. 13-14 at 7. For the reasons already stated, this Court concludes the state court applied the proper standard.

arresting officer] testified he created this audio tape when he interviewed [Petitioner] in his police car . . . .

[Petitioner] testified that the audio tape would have countered [the officer's] statements in the arrest report that he entered the victim's home. [Petitioner] stated that [the officer's] statements are what were used to charge him with Burglary of a Dwelling, Structure, or Conveyance While Armed.

In the audio tape, [Petitioner] did not expressly state that he entered the victim's home. However, [Petitioner] did admit to kicking in the door of the victim's home and shooting the victim's dog. Further, a casing from a gun was found inside the victim's home. Although [Petitioner] testified he did not cross the home's threshold and had an explanation for the casing, there was sufficient evidence to charge and convict [Petitioner] with burglary. Cf. State v. Spearman, 366 So. 2d 775, 776 (Fla. 2d DCA 1978) ("It is well established that the unqualified use of the word 'enter' in a burglary statute does not confine its applicability to intrusion of the whole body but includes insertion of any part of the body or of an instrument designed to effect the contemplated crime.").

Additionally, the Court notes that Porter and Taylor did demand discovery that would have included the disclosure of the audio tape. While Porter, Taylor, and Sieron did not review the audio tape, Shumard believed he did review the audio tape.[15] Despite evidence that his attorneys did not review of the audio tape, [Petitioner] did not present any evidence that had his attorneys reviewed the audio tape, the advice he

---

[15] In his Petition, Petitioner accuses Mr. Shumard of being "an active liar." Doc. 1 at 10, 17, 29, 31. Although unclear, it appears Petitioner believes Mr. Shumard made contradictory statements about whether he had reviewed the audio recording. See id. Petitioner's conclusory accusations have no support in the record. Indeed, at the postconviction evidentiary hearing, Mr. Shumard apprised the court that he could not recall with one hundred percent certainty whether he reviewed the audio recording. Doc. 13-11 at 740, 742. There is no indication the postconviction court found Mr. Shumard's testimony lacked credibility.

> received from his attorneys would have changed or that
> there was a particular defense available to him based
> on the audio tape that was likely to succeed at trial.
> Further, there is no evidence from [Petitioner's] former
> attorneys that their advice would have changed after
> reviewing the audio tape. Moreover, the audio tape
> contained evidence that was already known to
> [Petitioner]. The Court finds that [Petitioner] has failed
> to demonstrate that but for his attorneys' error, he
> would have insisted on going to trial. [Petitioner] is not
> entitled to relief on this claim.

Doc. 13-14 at 8-10 (internal record citations omitted). The First DCA per curiam

affirmed without a written opinion. Doc. 13-19. The Court will address the claim

in accordance with the deferential standard for federal court review of state

court adjudications.

The Court finds the record amply supports the state court's adjudication

of this claim. As addressed previously, Petitioner freely and voluntarily entered

a guilty plea after having been represented and advised by four attorneys,

having heard (more than once) the prosecutor summarize the facts based upon

the arresting officer's written report, and having himself known whether he told

the officer he walked inside the victim's home. Even assuming Petitioner did

not recall what happened the night of the incident because he was drunk, there

is no evidence he did not recall during his criminal proceedings what he did or

did not tell the officer three days later when he had not "had anything to drink

since th[e] day [of the incident]." See Doc. 13-11 at 530.

Moreover, Mr. Sieron testified at the evidentiary hearing that when he

took over the case, he spoke with Mr. Shumard, who "had done a lot of the discovery," and learned the facts developed through discovery were "pretty consistent" with what was "in the arrest and booking reports." Id. at 691. Petitioner never told Mr. Sieron he was concerned that the arresting officer or the prosecutor were lying about the facts supporting the burglary charge. Id. at 690. Mr. Sieron accepted the representation with only one week until trial "to facilitate an agreement between the State and [Petitioner]." Id. at 693. He and Petitioner "never [had] a discussion about [proceeding to] trial." Id. In short, there is no indication Petitioner was denied "reasonably effective assistance of counsel in connection with the decision to plead guilty." See Stano v. Dugger, 921 F.2d 1125, 1151 (11th Cir. 1991), overruled on other grounds, United States v. Garey, 540 F.3d 1253 (11th Cir. 2008) (quoting McCoy v. Wainwright, 804 F.2d 1196, 1198 (11th Cir. 1986)).

Upon thorough review of the record and the applicable law, the Court finds that the state court's adjudication of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Accordingly, this ineffective assistance of trial counsel claim is denied.

### ii.   Stand Your Ground Defense

In Ground Eleven, Petitioner contends his trial attorneys (without

naming which) were ineffective for failing to assert a Stand Your Ground defense on the aggravated assault charge. Doc. 1 at 29. He claims he was entitled to defend himself when his "neighbor was harassing [him on the side of the road] and would not leave," and his attorneys' failure to "offer[]" to him or discuss with him a potential Stand Your Ground defense was deficient. Id. Petitioner made similar allegations in his Rule 3.850 motions, but not in the context of an ineffective assistance of trial counsel claim. See Doc. 13-13 at 140. He raised it as a sufficiency of the evidence claim, asserting he "should not have been charged" with aggravated assault because has a "constitutional right to be left alone, [and] not bothered by some punk who had busted up [his] property in the past." Id. at 140-41.

The postconviction court summarily denied Petitioner's claim as not cognizable:

> [Petitioner] asserts that he should not have been charged with aggravated assault because section 776.012(2), Florida Statutes, or the Stand Your Ground Law[,] applies in his cases. [Petitioner] argues that the facts amount to a denial of self-defense and he has a constitutional right to be left alone. To the extent [Petitioner] challenges the sufficiency of the evidence, [his] claim is not cognizable in a rule 3.850 motion. See Smith [v. State], 41 So. 3d [1037,] 1040 [(Fla. 1st DCA 2010)]; Betts [v. State], 792 So. 2d [589,] 590 [(Fla. 1st DCA 2001)]. [Petitioner] is not entitled to relief on [this ground].

Doc. 13-14 at 16. The First DCA per curiam affirmed without a written opinion.

Doc. 13-19. To the extent this claim is different from the one Petitioner raised in his Rule 3.850 motions or it was denied on procedural grounds, the claim is unexhausted and procedurally defaulted, and Petitioner fails to show cause for or prejudice from this procedural bar.[16]

Regardless of whether Petitioner exhausted this claim, it is without merit. Petitioner acknowledged both orally and in writing he understood that by entering a guilty plea, he was giving up his right to a jury trial at which the state would have to prove the charges against him beyond a reasonable doubt and further that he had "sufficient time to consider all charges against [him], [and] all possible defenses." Doc. 13-11 at 597-602. He confirmed as much at the plea colloquy, saying he had "an opportunity to speak with [his] attorneys about the facts of . . . [his] cases and possible defenses." Doc. 13-1 at 97-100.

Petitioner's solemn declarations at the plea hearing "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge, 431 U.S. at 73-74. By entering a guilty plea, Petitioner waived the right to have his counsel investigate or put forward a defense. See Smith v. State, 41 So. 3d 1037, 1040 (Fla. 1st DCA 2010) (citing Davis v. State, 938 So. 2d 555, 557 (Fla. 1st DCA 2006)). Similarly, because he swore that he was "satisfied with his counsel's advice, he may not [collaterally] attack counsel's effectiveness for

---

[16] Respondents do not raise an exhaustion defense as to this or any other claim. See generally Doc. 12.

failure to investigate or defend the charge." Id. See also Stano, 921 F.2d at 1152 (recognizing that the record of the plea proceedings may contradict any subsequent claim that counsel's representation was deficient).

Moreover, there is no evidence that Petitioner would have been entitled to raise a Stand Your Ground defense. The undisputed facts showed that Petitioner's neighbor stopped on the side of the road to lend assistance, thinking Petitioner was stuck in a ditch, and Petitioner, who admittedly was a convicted felon driving while intoxicated, pulled a gun on him. Doc. 13-1 at 16, 21. See also Doc. 13-10 at 741-44. The victim brandished no weapon and made no threats by word or gesture. See Doc. 13-1 at 16, 21. See also Doc. 13-10 at 741-44. On these undisputed facts, a Stand Your Ground defense would have been meritless. See Fla. Stat. § 776.012 (1) ("A person is justified in using or threatening to use [non-deadly] force . . . against another when . . . the person reasonably believes that such conduct is necessary to defend himself . . . against [another person's] imminent use of unlawful force"); § 776.012 (2) (providing that a person may use or threaten to use deadly force against another "to prevent the imminent commission of a forcible felony" but only if the person "is not engaged in a criminal activity and is in a place where he . . . has a right to be).

Petitioner's trial attorneys cannot have been deficient for not discussing with him or raising on his behalf a defense that had absolutely no merit, nor

could such a failure have prejudiced him. <u>See</u> <u>Hill</u>, 474 U.S. at 59 ("[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial."); <u>United States v. Winfield</u>, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] a lawyer's failure to [assert or] preserve a meritless issue plainly cannot prejudice a client."); <u>Card v. Dugger</u>, 911 F.2d 1494, 1520 (11th Cir. 1990) ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit."). Accordingly, this ineffective assistance of trial counsel claim is denied.

### iii.   Ineffective Assistance of Appellate Counsel

In Ground Fourteen, Petitioner contends his appellate counsel was "grossly negligent by not correcting the filing . . . of [an] <u>Anders</u> Brief" after having reviewed Petitioner's pro se brief, which outlined numerous "[grounds] for appeal." Doc. 1 at 36. Petitioner did not raise this claim in a petition for writ of habeas corpus in the state appellate court, though he did raise it in his Rule 3.850 motions, which was procedurally improper. <u>See</u> Doc. 13-14 at 17 (postconviction court's summary denial of Petitioner's claim because it was not cognizable under Rule 3.850). Because Petitioner did not properly raise this claim in the state court, it is unexhausted and procedurally defaulted, and Petitioner fails to show cause for or prejudice from this procedural bar.

Regardless, the claim is meritless. On direct appeal, Petitioner's appointed counsel filed an <u>Anders</u> brief, representing Petitioner's appeal was "without merit" because he entered a plea and received a legal sentence. Doc. 13-4 at 8. Counsel concluded, "The plea colloquy was consistent with that required by law. There is no legal error worthy of a good faith argument after a review of the entire record, researching any applicable law, and exercising professional judgment." <u>Id.</u> at 10.

Petitioner thereafter filed a pro se initial brief, raising the following issues: he was denied the effective assistance of counsel; the prosecutor falsely represented to the trial court at his bail reduction hearing that he walked inside the victim's home; the prosecutor "withheld [the] audio tape [of his police interview] from discovery material"; the victim provided conflicting statements to police; the trial court improperly denied him a continuance after he hired Mr. Sieron and was biased against him; in sentencing Petitioner, the trial court improperly found the aggravated assault was a separate episode from the burglary; he was coerced into entering a guilty plea; the facts were insufficient to justify an armed burglary charge because he did not go inside the victim's home and had no intent to commit a crime; his convictions and sentences violated double jeopardy; and the search warrant affidavit lacked probable cause. Doc. 13-5 at 3, 5, 7-8, 10-15, 18-20, 24.

Even if Petitioner's appellate counsel was deficient by not raising on

appeal a claim or claims Petitioner asserted in his pro se brief, Petitioner cannot show that but for appellate counsel's failure the outcome of the appeal would have been different. The First DCA considered the issues Petitioner raised in his pro se brief and found them meritless, per curiam affirming the trial court's judgment and sentence without a written opinion. See Doc. 13-8. As such, Petitioner cannot demonstrate prejudice under Strickland. See Smith v. Robbins, 528 U.S. 259, 285 (2000) (holding the Strickland test applies to a claim "that appellate counsel was ineffective in not filing a merits brief"). Petitioner's ineffective assistance of appellate counsel claim is denied.

### C. Brady Violation[17]

In Grounds Two, Five, Six, Ten, Twelve, Thirteen, and Fourteen, Petitioner claims the state improperly withheld exculpatory evidence: the audio recording of his interview inside the arresting officer's police car; and the recording of a purported second interview, which Petitioner contends occurred at his kitchen table.[18] Doc. 1 at 7, 12-13, 15-16, 18-19, 28, 31-34, 37. Petitioner asserted these allegations in separate grounds in his Rule 3.850 motions—in

---

[17] The Eleventh Circuit "has not decided whether a guilty plea waives a Brady claim." United States v. McCoy, 636 F. App'x 996, 998-99 (11th Cir. 2016) (citing United States v. Matthews, 168 F.3d 1234, 1242 (11th Cir. 1999)). For purposes of this Order, the Court presumes Petitioner can raise this claim despite having entered a guilty plea.

[18] Petitioner also alleges he is "awfully sure the recording [of his interview inside the police car] has been changed" or "tampered with." Doc. 1 at 7, 24. See also Doc. 13-11 at 532-33. Petitioner's suppositions that the audio recording was tampered with are wholly conclusory. There is no evidence supporting his accusations.

ground two, as a <u>Brady</u> violation for the prosecutor's failure to disclose the audio recording of the interview inside the arresting officer's police car, and in sub-claim B of ground four (as labeled by the postconviction court), as an ineffective assistance of trial counsel claim for counsel's failure to investigate and discover the recording of a second purported interview. Doc. 13-14 at 5, 8-9.

First, in denying Petitioner's <u>Brady</u> claim related to the audio recording of the interview inside the police car, the postconviction court found as follows:

> [Petitioner] argues the State suppressed a "confession audio tape" that is referenced in the Clay County Sheriff's Office report [supporting his arrests in case numbers 2015-CF-1136 ad 2015-CF-1158,] in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). [Petitioner] states that the audio tape was not made available to him, neither the audio tape nor transcript of the audio tape was in the defense file, and none of his attorneys stated on the record that they have heard the audio tape. [Petitioner] asserts that the audio tape proves the statements [the arresting officer] made in the arrest report were perjured.
>
> To establish a <u>Brady</u> violation, a defendant must demonstrate that "(1) the evidence was favorable to the [defendant], either exculpatory or for impeachment purposes, (2) the state suppressed the evidence, either willfully or inadvertently, and (3) the [defendant] was prejudiced by the suppression of the evidence." <u>Taylor v. State</u>, 848 So. 2d 410,412 (Fla. 1st DCA 2003). To sufficiently allege that the suppression of the evidence prejudiced a defendant in the context of a guilty plea, the defendant must allege that "he would not have entered a plea and proceeded to trial, but for the state's suppression of the favorable evidence." <u>Id.</u>
>
> On October 9, 2015, in case number 2015-CF-1136, the State disclosed in its State's Discovery

> Exhibit and Demand For Reciprocal Discovery "all items of evidence listed in police reports." With respect to this disclosure, the State provided that the "Defense may inspect, copy, test or photograph" the items. Further, Shumard testified that although he could not say it when [sic] 100% certainty, he did review the audio tape prior to taking the deposition of [the arresting officer]. So it is at least apparent that [Petitioner's] first counsel was aware of the audio tape. The Court finds that [Petitioner] does not demonstrate that the State suppressed the audio tape. [Petitioner] is not entitled to relief on this claim.

Id. at 5-6 (internal record citations and footnote omitted). The First DCA per curiam affirmed without a written opinion. Doc. 13-19. The Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.

As the state court found, the record flatly refutes that the state withheld audio evidence. There is no dispute Petitioner's counsel received and reviewed a copy of the arresting officer's report and took the officer's deposition. Doc. 13-11 at 694, 700, 713, 739-40. The officer's written report explicitly mentioned the existence of an audio recording. Doc. 13-10 at 747-48 ("My interview with the defendant was audio recorded . . . . Authorized personnel wishing to hear the defendant's statements in their entirety should refer to the recording."). Even in his pro se brief on direct appeal, Petitioner acknowledged that the officer's report "constantly refer[s] to" the existence of an audio recording. Doc. 13-5 at 11. Moreover, not only did Mr. Shumard recall having received a copy of the

37

audio recording, but Mr. Taylor testified at the evidentiary hearing that during the one month in which he represented Petitioner, he learned of and was actively attempting to obtain the audio recording. Doc. 13-10 at 712, 721-22, 740-42.

Upon thorough review of the record and the applicable law, the Court finds that the state court's adjudication of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Petitioner is not entitled to relief on this Brady claim.

Second, as to Petitioner's contention that the state committed a Brady violation by withholding a second recorded interview, Petitioner did not raise this same claim in state court. Therefore, it is unexhausted and procedurally defaulted, and Petitioner fails to show cause for or prejudice from this procedural bar. Regardless, however, the claim lacks merit. In denying Petitioner's claim that his attorneys were deficient for failing to obtain audio recordings of his purportedly two interviews, the postconviction court found the following:

> [The arresting officer] testified he only interviewed [Petitioner] in his police car and his conversation at the kitchen table only involved the reading and review of the search warrant. [The officer] testified the conversation at the kitchen table was not recorded. The

> Court finds [the officer's] testimony credible. It is
> apparent from [the officer's] testimony that his arrest
> report summary was based on [Petitioner's] interview
> [in] his police car. To the extent there is another audio
> tape, [Petitioner] did not allege and did not testify that
> he made any statements different from those he made
> in the audio tape introduced at the evidentiary hearing.
> As such, the Court considers the audio tape introduced
> during the evidentiary hearing, which the Court has
> reviewed, as the sole audio tape with respect to
> [Petitioner's] claim.

Doc. 13-14 at 9 (internal record citations omitted). Petitioner does not demonstrate by clear and convincing evidence that the state court's factual findings are incorrect, and thus, they are "presumed to be correct" under AEDPA's deferential standard of review.[19] See 28 U.S.C. § 2254(e)(1). See also Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011) ("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review."). The prosecutor could not have disclosed (or withheld) evidence that did not exist. Thus, this Brady claim is denied.

---

[19] In his Reply, Petitioner says that because he was granted an evidentiary hearing on only some of his grounds for relief, he was "not provide[d] a full, fair, [or] adequate hearing at the 3.850 proceeding, disallowing the state court's factual findings a presumption of correctness." See Doc. 18 at 4. The conclusory assertion is insufficient.

### D. Giglio[20] Violation

In Grounds Six, Ten, Twelve, Thirteen, and Fourteen, Petitioner contends the state committed a Giglio violation by "corruptly instigat[ing] charges [based on the arresting officer's] known fabrication of entry and confession statements" and "falsely present[ing] [the arresting officer's] statements as true" by relying solely on the officer's written report rather than the audio transcript of his interview. Doc. 1 at 16, 27, 32-33, 37. Petitioner appears to have raised a similar claim on direct appeal, arguing the prosecutor relied on the officer's "perjured" version of facts in bringing the charges against him and at his bail reduction hearing, the final pretrial hearing, and his sentencing hearing. Doc. 13-5 at 3-4.[21]

Assuming this claim is exhausted, Petitioner waived it by freely and voluntarily, and with the assistance of constitutionally competent counsel, entering an open plea of guilty to all charges. See Tollett v. Henderson, 411 U.S. 258, 267 (1973) ("When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may

---

[20] Giglio v. United States, 405 U.S. 150 (1972). "Giglio error is a species of Brady error that occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" Ventura v. Att'y Gen., Fla., 419 F.3d 1269, 1276-77 (11th Cir. 2005) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).

[21] Petitioner also raised the claim in his Rule 3.850 motions, but the postconviction court did not rule on the merits of it because "a prosecutorial misconduct claim . . . is not . . . cognizable" under Rule 3.850. Doc. 13-14 at 11.

not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."); McMann v. Richardson, 397 U.S. 759, 772 (1970) ("[A] plea of guilty in a state court is not subject to collateral attack in a federal court on the ground that it was motivated by a coerced confession unless the defendant was incompetently advised by his attorney.").

Alternatively, the claim lacks merit. The Eleventh Circuit has addressed the parameters of a Giglio claim:

> A defendant's right to due process is violated when the prosecution's case includes perjured testimony and ... the prosecution knew, or should have known, of the perjury. This is a violation under Giglio ..., and to prevail on this claim, a defendant must establish that the prosecutor knowingly used perjured testimony ... and that the falsehood was material.

Phillips v. United States, 849 F.3d 988, 992-93 (11th Cir. 2017) (first and third alterations in original) (internal citation omitted). "[T]o succeed on a Giglio claim, a petitioner must prove (1) that the prosecution used or failed to correct testimony that he knew or should have known was false and (2) materiality— that there is any reasonable likelihood the false testimony could have affected the judgment." Rodriguez v. Sec'y, Fla. Dep't of Corr., 756 F.3d 1277, 1302 (11th Cir. 2014).

Neither Petitioner nor Respondents address whether a prosecutor's in-court summary of the facts supporting charges against a defendant constitutes

"testimony" within the meaning of <u>Giglio</u> when the defendant does not proceed to trial. <u>See</u> <u>Giglio</u>, 405 U.S. at 153-54 (reasoning that a new trial was warranted when the prosecutor's key witness said under oath that he had not been promised anything in exchange for his trial testimony, when in fact he had, and the truth was reasonably likely to have "affected the judgment of the <u>jury</u>" (emphasis added)); <u>United States v. Alzate</u>, 47 F.3d 1103, 1110 (11th Cir. 1995) (recognizing a <u>Giglio</u> claim may proceed even when it is premised on the prosecutor's "representations" made during trial because such false representations are tantamount to "prosecutorial misconduct and a corruption of the truth-seeking function").

Assuming Petitioner may proceed on a <u>Giglio</u> claim under the circumstances and accepting that the officer's alleged false statements in his report can be attributed to the prosecutor, there is no reasonable likelihood the false statements affected the judgment. By entering an open plea of guilty to all charges, including the burglary charge, Petitioner agreed—both in writing through the plea agreements and orally through the plea colloquy—that he understood the charges against him, including the "facts" supporting the charges and that he was giving up the "right to challenge the State's evidence" at trial at which the "State would be required to call witnesses and produce other evidence to prove [him] guilty beyond a reasonable doubt." Doc. 13-1 at 98-99; Doc. 13-11 at 597-602.

With respect to the facts supporting the burglary charge, Petitioner concedes in his Petition and through reference to exhibits he attaches that he knew well before he entered his plea that the state's case against him was premised on the facts summarized in the police report, including that Petitioner was believed to have walked inside the victim's home after he kicked in the door. See Doc. 1 at 13, 16-17. See also Doc. 1-2 at 243. At the evidentiary hearing on his Rule 3.850 motions, Petitioner conceded he heard the state's factual basis for the burglary charge as early as at his bail reduction hearing in September 2015:

> [Attorney:]       Do you remember at previous court appearances [sic] bail reduction hearings, pretrials, do you remember hearing summaries by the State Attorney's Office as to what [the arresting officer] had said about your –
>
> [Petitioner:]       I remember ASA Demers making lies and I didn't know where they were coming from.
>
> [Attorney:]       When you say "ASA Demers," are you referring to the prosecutor?
>
> [Petitioner:]       Correct.
>
> [Attorney:]       Okay. So previous court appearances prior to entering your plea, you had heard the state attorney make some remarks in court about your alleged admissions.
>
> [Petitioner:]       I heard her make -- yeah. She actually lied about what I admitted to. I didn't know where that was coming from.

Doc. 13-11 at 678, 684. Petitioner testified that he never spoke with Mr. Sieron

about his concerns before entering his plea because "[i]t was late in the game," and he was focused on getting a continuance so he could "go to trial." Id. at 678-79, 684. He admitted, however, that he raised the discrepancy with his previous attorneys, but "[t]hey didn't seem to be doing anything about [it]." Id. at 679.

Petitioner's first attorney, Mr. Porter, testified that Petitioner asked him "why [the prosecutor] was allowed to put the State's version of the facts on the record at the bond hearing," confirming Petitioner heard the state's factual basis for the charges against him. Id. at 727, 729-30. Mr. Porter also testified that he spoke with Petitioner about the elements of all charges against him and recalled that Petitioner "question[ed], essentially, everything that law enforcement said or did." Id. at 732, 733-35.

At the bail reduction hearing, the prosecutor said the burglary charge was based on the following facts: Petitioner "went to the [v]ictim's house to confront him, . . . kicked in the front door, [and] went inside." Doc. 1-2 at 244-45. In denying Petitioner's motion to reduce his bail, the trial judge underscored the importance of the allegation that Petitioner had entered the victim's home:

> I have considered the facts and when I first saw the bond . . . I didn't know what [the judge who set the bond] was thinking, but when I read the actual facts of the case and then found out that [Petitioner] went into the house to confront the [v]ictim and when he couldn't find him he shot his dog, I was actually surprised that $50,000 bond was as low as it was on that charge.

Id. at 245-46.[22]

Regardless of what Petitioner's attorneys knew, Petitioner himself was in the best position to know whether he went inside the victim's home or whether he told the arresting officer as much, yet he still chose to plead guilty to the burglary charge based on the state's factual basis for that charge. Moreover, even had Petitioner not walked inside the victim's home, Petitioner admitted to kicking open the front door and shooting the victim's dog. See Doc. 13-11 at 533. Based on these undisputed facts, the state was justified in charging Petitioner with burglary. See Fla. Stat. § 810.02(1)(b) ("[B]urglary means [e]ntering a dwelling, a structure, or a conveyance with the intent to commit an offense therein." (internal punctuation omitted)). See also Polk v. State, 825 So. 2d 478, 480 (Fla. 5th DCA 2002) ("[T]he unqualified use of the word 'enter' in a burglary statute does not confine its applicability to intrusion of the whole body but includes insertion of any part of the body or of an instrument designed to effect the contemplated crime." (quoting State v. Spearman, 366 So. 2d 775, 776 (Fla. 2d DCA 1978)). Accordingly, Petitioner's Giglio claim is denied.

**E. Double Jeopardy**

In Ground Seven, Petitioner argues he was punished twice for the same

---

[22] Petitioner did in fact tell the officer that he went to the victim's house intending to confront someone. See Doc. 13-11 at 533. When the officer asked Petitioner why he went to the victim's house, Petitioner responded, "I don't know, I think, I just wanted to chew somebody out." Id.

offense in violation of double jeopardy. Doc. 1 at 20. According to Petitioner, he was wrongly convicted of aggravated assault with a deadly weapon, armed burglary, and possession of a firearm by a convicted felon given the weapon involved in all three charges was the same, and the separate charges arose from "one continuous action," rather than from separate and distinct episodes as the trial court found. Id. Petitioner raised this claim in his Rule 3.850 motions. Doc. 13-13 at 91, 132. In summarily denying the claim, the postconviction court found as follows:

> [Petitioner] argues his convictions for Aggravated Assault and Possession of a Firearm by a Convicted Felon constitute a double jeopardy violation because the convictions involve the same gun. To support his claim, [Petitioner] relies on Gracia v. State, 98 So. 3d 1243 (Fla. 3d DCA 2012). [Petitioner's] reliance on Gracia is misplaced.

> In Gracia, the trial court found that convictions for aggravated assault with a firearm and unlawful possession of [the same] firearm while engaged in commission of a felony, with the felony being the aggravated assault, was a double jeopardy violation. However, the possession of a firearm charge in Gracia was a different charge than the possession charge here in [Petitioner's] case. In case 2015-CF-1135, [Petitioner] was convicted of Aggravated Assault With a Deadly Weapon under section 784.021(1)(a), Florida Statutes (2015). In case 2015-CF-1158, [Petitioner] was convicted of Possession of a Firearm by a Convicted Felon under section 790.23(1)(a), Florida Statutes (2015). "Separate convictions and sentences may be imposed upon a defendant for crimes arising out of the same criminal episode if each crime requires proof of an element that the other crimes do not-if the crimes have

> different elements, separate convictions and sentences are valid." <u>Montgomery v. State</u>, 704 So. 2d 548, 551 (Fla. 1st DCA 1997). Aggravated assault with a deadly weapon and possession of a firearm by a convicted felon each contain elements that the other offense does not. For example, the aggravated assault with a deadly weapon does not contain an element requiring a defendant have a prior felony conviction. <u>See</u> <u>id.</u> Therefore, [Petitioner's] convictions on both charges were not barred by double jeopardy. <u>See</u> <u>Id.</u> [sic]; <u>Blockburger v. United States</u>, 284 U.S. 299 (1932).[23] [Petitioner] is not entitled to relief on this claim.

Doc. 13-14 at 12-13. The First DCA per curiam affirmed without a written opinion. Doc. 13-19. The Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.

Upon thorough review of the record and the applicable law, the Court finds that the state court's adjudication of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Petitioner's double jeopardy claim is denied.

---

[23] In <u>Blockburger</u>, the Court explained that a single act may constitute more than one criminal offense. 284 U.S. at 304 ("The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

## F. Fourth Amendment Violation

In Grounds Nine, Ten, Thirteen, and Fourteen, Petitioner contends the arrest and search warrants executed against him and the state's charging documents were based on "perjury" or the "illegal acts of state actors," i.e., the arresting officer and prosecutor. Doc. 1 at 26-27, 33-34, 38. He claims to have been the victim of an "unreasonable seizure" because the arrest and search warrants were obtained on "an illegal basis for probable cause" and contrary to Florida statutes section 90.604.[24] Id. at 27, 34. He further asserts there was a "[f]undamental defect [in the] [I]nformations."[25] Id. at 26.

Petitioner raised these allegations in separate grounds of his Rule 3.850 motions. See Doc. 13-14 at 15-16, 17. The postconviction court summarily denied the claims, concluding that "[c]laims of insufficient evidence and trial court error are not cognizable" under Rule 3.850; Petitioner did not allege "a fundamental defect in the Informations," so any such claim had been waived; and any ineffective assistance of counsel claim was "facially insufficient." Id. at 16, 17. The First DCA per curiam affirmed without a written opinion. Doc. 13-19.

---

[24] Section 90.604 applies to witness testimony. See Fla. Stat. § 90.604 ("[A] witness may not testify to a matter unless evidence is introduced which is sufficient to support a finding that the witness has personal knowledge of the matter.").

[25] Petitioner references the "Informations"—plural—but it appears he challenges solely the Information for the armed burglary charge.

To the extent the state court found Petitioner did not properly raise his claims in state court, the claims are unexhausted and procedurally defaulted, and Petitioner fails to show cause for or prejudice from this procedural bar. To the extent Petitioner raises a claim based on a violation of state law, his claim is not cognizable in this federal habeas action. To the extent Petitioner raises constitutional concerns related to the arrest or search warrants, his claim is meritless because "when a defendant is convicted pursuant to [a] guilty plea rather than a trial, the validity of that conviction cannot be affected by an alleged Fourth Amendment violation …." Haring v. Prosise, 462 U.S. 306, 321 (1983). In other words, "a Fourth Amendment claim is irrelevant to the constitutionality of [a] criminal conviction, and for that reason may not be the basis of a writ of habeas corpus." Id. at 322.[26]

Finally, to the extent Petitioner challenges the sufficiency of the Information on the armed burglary charge, his claim lacks merit. "The sufficiency of a state indictment or information is not properly the subject of federal habeas corpus relief unless the indictment or information is so deficient that the convicting court is deprived of jurisdiction." DeBenedictis v. Wainwright, 674 F.2d 841, 842 (11th Cir. 1982). The Information on the armed

---

[26] Petitioner also contends in his Petition that the prosecutor violated his civil rights, citing 42 U.S.C. § 1983, by "making false statements . . . in  . . . [an] application for [an] arrest warrant" and as such, is not entitled to "prosecutorial immunity." Doc. 1 at 38. Petitioner may not pursue a civil rights claim in this habeas corpus action.

burglary charge included Petitioner's name, the date and location of the incident, and provided that Petitioner "unlawfully enter[ed] . . . a dwelling [of another] . . . with the intent to commit an offense therein, and was armed with . . . a firearm."[27] The Information met the minimum requirements for invoking the jurisdiction of the state circuit court. See Fla. Stat. § 26.012(2)(d) (providing that Florida circuit courts have jurisdiction over all felonies).

Additionally, as the postconviction court concluded and as addressed previously in this Order, given Petitioner admitted to kicking open the door of the victim's home and shooting his dog, and given a bullet casing was found inside the home, "there was sufficient evidence to charge . . . [Petitioner] with burglary." See Doc. 13-14 at 9. By pleading guilty, Petitioner freely and voluntarily waived his right to have the state prove this charge against him beyond a reasonable doubt.

Accordingly, the Fourth Amendment and related claims raised in Grounds Nine, Ten, Thirteen, and Fourteen are denied.

### G. Eighth Amendment Violation

In Ground Eight, Petitioner vaguely claims that his sentences constitute cruel and unusual punishment because his convictions were based on "perjury."

---

[27] The Information for case number 2015-CF-1136, in which Petitioner was charged with armed burglary, is not in the record. The Court takes judicial notice of it from the state court docket. See Clay County Clerk of Court, Court Records, available at https://clayclerk.com/search-records/ (last visited Aug. 23, 2024).

Doc. 1 at 22. To the extent Petitioner is rephrasing or reiterating a claim already addressed in this Order, the claim is denied for the reasons previously stated. To the extent Petitioner is attempting to raise a claim he did not raise in the state court, the claim is unexhausted and procedurally defaulted, and Petitioner fails to show cause for or prejudice from this procedural bar.

To the extent Petitioner is attempting to raise the same claim he raised in his Rule 3.850 motions, his claim is not cognizable because in state court, he complained about the trial court's application of state law. See Doc. 13-14 at 14 (summarizing Petitioner's claim as a challenge to the trial court's application of Florida statutory law in running his sentences consecutively). In denying Petitioner's construed claim that his sentences were illegal, the postconviction court stated as follows:

> [Petitioner] also alleges his sentences should have been imposed concurrently. The Court liberally construes his allegations as a claim that his consecutive sentences are illegal. Here, the Court ordered the sentences imposed in case numbers 2015-CF-1136 and 2015-CF-1158 to run consecutive to the sentences imposed in case number 2015-CF-1136.

> "Sentences of imprisonment for offenses not charged in the same indictment, information, or affidavit shall be served consecutively unless the court directs that two or more of the sentences be served concurrently." § 921.16(1), Fla. Stat. (2015). However, "sentences imposed under a sentencing enhancement statute may not run consecutively if the offenses occurred during a single criminal episode." Murray v. State, 890 So. 2d 451, 453 (Fla. 2d DCA 2004).

51

> Here, the sentences for Aggravated Assault With a Deadly Weapon; Burglary of a Dwelling, Structure, or Conveyance While Armed; and Possession of a Firearm by a Convicted Felon were imposed under 775.087, Florida Statutes, a sentencing enhancement statute. After hearing argument from counsel during the sentencing proceedings, the Court determined there was "a separation both temporally and geographically between the aggravated assault and the possession of a firearm by a convicted felon and the breaking and entering into the victim's house" and therefore, it could impose the sentences consecutively. To the extent [Petitioner] argues the Court erred in making this determination, that it is a matter that could have been or should have been raised on direct appeal. See Bruno, 807 So. 2d at 63; Johnson, 985 So. 2d at 1215. Defendant is not entitled to relief . . . .

Id. at 14-15. The First DCA per curiam affirmed without a written opinion. Doc. 13-19.

This Court's task on habeas review "does not encompass inquiry into the motivations behind the trial court's rulings . . . [but rather is focused on] only the constitutional implications of those rulings." Jones v. Goodwin, 982 F.2d 464, 471-72 (11th Cir. 1993). See also McCoy v. Newsome, 953 F.2d 1252, 1264 (11th Cir. 1992) ("A federal habeas corpus court may not interfere with a state court's interpretation of state law absent a constitutional violation."). Because Petitioner merely disagrees with the state court's application or interpretation of state law, this claim is denied.

## H. Breakdown in Judicial System / Violation of Due Process

Throughout his Petition (Grounds One, Five, Eight, Nine, Ten, Twelve,

and Fourteen), Petitioner vaguely complains of a "complete breakdown of Florida['s] judicial system," which he claims is "corrupt" because it is "designed and intended to abridge privileges and immunities of citizens of the United States," including the right to due process and to be presumed innocent until proven guilty. Doc. 1 at 5, 12, 15, 22-23, 25-26, 28-30, 37, 39. Aside from his repetitive complaints that the arresting officer "perjured" his report and section 14 of the Florida Constitution "contravenes" the federal Constitution, Petitioner points to the following as examples of what he perceives to be evidence of a "malfunctioning" legal system: the trial court's various pretrial rulings (e.g., denying him reduced bail and a continuance) and rulings on or related to his Rule 3.850 motions; the trial court's conflict of interest in that the judge who presided over his criminal cases "sat in judgment in [his] dissolution of marriage proceeding"; the trial court's supposed knowledge of Mr. Shumard's "employment as [an assistant] state attorney" when he was representing Petitioner; the trial court's "ex parte" communications;[28] the trial court's denial of post-judgment discovery requests; and the First DCA's denial of his motions and per curiam affirmances, which Petitioner says were "secretive" and "unreviewable." Id. at 13, 21-23, 25-26, 28, 30, 37, 39.

---

[28] Although exceedingly unclear, it appears Petitioner believes the trial judge's reading and consideration of the police report constituted "ex parte" communications. See Doc. 1 at 30, 35.

Insofar as Petitioner contends that the state trial, appellate, and postconviction courts' various rulings deprived him of due process of law, or he merely asks this Court to "interfere with the state court's interpretation of state law absent a constitutional violation," his claims are not cognizable. This is especially true with respect to his attack on the collateral proceedings. See Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."). See also Newsome, 953 F.2d at 1265. Petitioner's claims challenging the state court judicial system are denied.

Accordingly, it is

**ORDERED**:

1.     The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.     If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[29]

---

[29] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To

3.      The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of September, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-6
c:
Dennis O. Christensen
Counsel of Record

---

make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.